UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JAMES NEATON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:09-cv-213 |
| v. ) | *Mattice / Lee* |
| ) | |
| HARTFORD LIFE & ACCIDENT ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Plaintiff James Neaton ("Plaintiff" or "Neaton") brought this ERISA[1] action against Defendant Hartford Life & Accident Insurance Company ("Defendant" or "Hartford"), seeking reinstatement of long term disability ("LTD") benefits under a Group Long-Term Disability Insurance Plan (the "Plan") sponsored by his employer, Navy Federal Credit Union ("Navy").[2] The parties each moved for judgment on the pleadings [Doc. 22; Doc. 25], and the motions were referred to the undersigned for a report and recommendation [Doc. 37].

Briefly, Hartford terminated Plaintiff's LTD benefits after concluding he could perform his previous job with reasonable accommodations – namely, working from home. Plaintiff suffers from a condition known as Gorlin's Syndrome, which causes numerous and frequent skin cancers that must be surgically removed. Plaintiff argues he is unable to perform his job due to the recovery periods associated with his surgeries. For the reasons below, I **RECOMMEND** that Plaintiff's

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B); 29 U.S.C. § 1132 (a)(1)(B).

[2] The Plan was also technically administered by Navy, but Navy delegated to Hartford the sole discretionary authority to determine eligibility for benefits (AR 34).

motion for judgment on the pleadings [Doc. 22] be **DENIED**, Defendant's motion for judgment on the pleadings [Doc. 25] be **GRANTED**, and this action be **DISMISSED WITH PREJUDICE**.

**I.  BACKGROUND**

  **A.  Plaintiff's Claim for LTD Benefits**

On his last day of work, September 5, 2007, Plaintiff had been working for Navy for 32 years (AR[3] 41, 139). Plaintiff worked as an LCR Counselor, Navy's term for a debt collector, "recovering outstanding debts, negotiating repayments with att[orneys], maintain[ing] records chronologically[,] and handl[ing] settlement offers" (AR 125, 501-03).[4]

Long before he started working with Navy, Plaintiff was diagnosed with Gorlin's Syndrome in the fourth grade (AR 127). Gorlin's is a rare genetic defect which causes Plaintiff to develop numerous basal cell carcinomas (skin cancers), cysts, and other lesions (AR 92, 124, 139). Those cancers, which unlike most basal cell carcinomas are prone to metastasizing, are removed by one of two methods: curettage and cautery ("scooping or scraping" and "burning") or Moh's surgeries (AR 132, 377). Moh's surgeries are necessary when the cancers have progressed too far to be removed by curettage and cautery, and they are more extensive, sometimes requiring skin grafts (AR 113-14, 127).

The day after his last day of work, September 6, 2007, Plaintiff was scheduled for a curettage and cautery procedure to remove 14 skin lesions (AR 139, 243). Plaintiff could not work because he stated he could no longer "handle" the number of surgeries and recovery periods (AR 297).

---

[3] Citations are to the administrative record ("AR") filed in hard copy form with the Clerk's office.

[4] Plaintiff does not dispute this characterization of his job duties.

2

Through the Plan, Plaintiff was insured against long term disability[5] by Hartford (AR 44-75). Believing he was unable to work anymore, Plaintiff filed for LTD benefits (AR 508-13). Plaintiff's dermatologist, Jeffrey Schuldenfrei, M.D., provided a letter describing the treatment and limiting Plaintiff to "no work" (AR 136, 139, 253, 514-17).[6] Specifically, Dr. Schuldenfrei explained that Plaintiff should avoid exposure to sunlight and light from fluorescent lighting (AR 139, 526).

Because Plaintiff had been suffering from Gorlin's for some time, Hartford contacted Plaintiff in order to ascertain the "reason for stopping work now" (AR 138). Plaintiff informed Hartford he needed Moh's surgeries "every month" because cancer was coming back in places it had previously been removed (AR 114, 136).[7] Hartford was aware, as early as November 2007, that Gorlin's syndrome is progressive: as patients age, the number of skin cancers increase and are made worse by exposure to sunlight (AR 132). So, because Plaintiff was commuting an hour to work each day, presumably with the attendant exposure to sunlight, a Hartford claims examiner recommended

---

[5] The parties do not dispute the terms of the Plan, which contained a fairly common provision defining disability during the first twelve months after the elimination period as the insured's inability to perform the "material and substantial duties" of his regular occupation, and after that twelve months, the inability to perform any occupation (AR 51-52). Material and substantial duties are those "which cannot be reasonably omitted or altered (AR 67). The parties' dispute turns on a factual dispute regarding whether Plaintiff was capable of performing his former job.

[6] Hartford states as an "undisputed" fact that Plaintiff requested that Dr. Schuldenfrei limit him to "no work" [Doc. 26 at 5]. Hartford misreads the record. Plaintiff did acknowledge that he told Dr. Schuldenfrei he could not work anymore, but instead of providing a "no work" letter, Dr. Schuldenfrei advised Plaintiff to seek counseling (AR 136). As Plaintiff informed Hartford, he was still working when those counseling sessions began (AR 136).

[7] Plaintiff also explained his "nerves [we]re shot" due to embarrassment about his physical appearance and anger at his boss, who had accused him of having pornography on his computer in some sort of "joke" (AR 133, 136-37). Hartford concluded Plaintiff did not have any work restrictions resulting from a mental condition, but noted that his physical condition might well cause psychological symptoms (AR 132). Plaintiff does not attribute his disability to a mental condition in his motion for judgment.

3

his LTD claim be approved (AR 132).

That recommendation was "deferred" pending the receipt of updated treatment notes from Dr. Schuldenfrei (AR 130), which stated that Plaintiff underwent another curettage and cautery procedure on November 1 and was to follow up with Dr. Schuldenfrei every month (AR 129, 132, 240). Hartford decided to wait for information regarding whether Plaintiff's condition could be accommodated before making a benefits decision (AR 129). On December 10, 2007, Hartford interviewed Plaintiff to inquire about the effect of his surgeries on his ability to work (AR 127-28). Plaintiff told the interviewer he was scheduled for yet another surgery on December 13, 2007, and that he was "needing more s[urgeries]" as his condition progressed (AR 127, 485). Plaintiffs also explained that he needed "time to recoup" after surgeries because of his "nerves," embarrassment, depression, facial swelling, pain medication, bandaging, and bleeding (AR 127, 296). Plaintiff appeared to attribute some of his work limitations to difficulties associated with physically attending work rather than performing work tasks. For example, Plaintiff was scared to drive because of sun exposure, and he believed coworkers were talking about his appearance (AR 127-28). When the interviewer broached the possibility of Plaintiff working from home, Plaintiff did not offer any reason he could not, but stated that he did not believe his employer would allow it (AR 128).

### B.     Initial Claim Approval

On December 19, 2007, Hartford approved Plaintiff's claim for LTD benefits (AR 123, 176-79). Although Hartford was still "working on accommodations to [Plaintiff] to [return to work] either in a special room or at home," Hartford determined that "it [wa]s reasonable that [he] would be unable to function in a regular environment with sunlight and fluorescent lighting" (AR 125). Hartford noted that "each exposure" to sunlight or fluorescent lighting created a risk for additional

4

skin cancers, as well as "organ involvement" as the disease progressed (AR 125). Hartford's analysis suggested that limiting sun exposure would reduce the recurrence of, but "w[ould] not prevent all" of Plaintiff's skin cancers (AR 124). Hartford concluded that Dr. Schuldenfrei's limitations and restrictions were "supported" (AR 125). A month later, on January 23, 2008, Plaintiff underwent an eight-hour surgery to remove a lesion from his ear (AR 113, 116, 280-86). Plaintiff called it "the worst s[urgery] of his life" and noted it was the first time he had needed a skin graft (AR 113-14).

      C.      **Continued Review of Plaintiff's Claim**

In March 2008, Navy informed Hartford it was willing to consider whether Plaintiff could return to work with appropriate accommodations. To "update" its assessment of Plaintiff's ability to work (AR 115), Hartford contacted both Plaintiff and Dr. Schuldenfrei for more information. Plaintiff reported he was still "tender" from his January surgery and was scheduled for another surgery on both ears and his scalp (AR 113). Plaintiff stated he needed three to four months to recover from a Moh's surgery, but only one month to recover from a "regular" surgery (AR 113). Dr. Schuldenfrei reported that he was treating Plaintiff "frequently" and that on a typical visit, he discovered between 5 and 50 new skin cancers (AR 113, 418). Dr. Schuldenfrei opined Plaintiff "could work in his home environment," provided, of course, that he was protected from ultraviolet light (AR 111, 418). He also reported that Plaintiff's recovery time "varie[d] greatly," from several days for "superficial" surgeries and "a week or more" for Moh's surgeries (AR 111, 418). Dr. Schuldenfrei noted that during the previous two years, Plaintiff's cancers had become more aggressive, necessitating more of the Moh's surgeries (AR 111, 418). Dr. Schuldenfrei anticipated that surgeries would be required on a monthly basis "for the foreseeable future" (AR 111, 418).

5

On May 1, 2008, Hartford began an employability analysis review in an attempt to "match" Plaintiff to other positions he could perform with his restrictions (AR 106). At first, Hartford found none available in which Plaintiff could earn a comparable salary (AR 106). Later that same day, however, Navy agreed to accommodate Plaintiff's condition by allowing him to perform his former job at home (AR 105). Hartford also forwarded Plaintiff's file to Rehabilitation and Re-Employment, Inc., for an occupational research survey (AR 103). According to the results (AR 398-401, which were received on May 22, 2008, the duties of Plaintiff's former job could be performed from home (AR 81, 102, 398). The report identified five suitable full-time positions: Loan Counselor, Collections/Sales Representative, Collections Account Representative, Customer Service Agent, and Telemarketer (AR 79, 81, 398-400).

On May 2, 2008, a note appeared in Plaintiff's file stating that Hartford intended to conduct a "peer review" of Dr. Schuldenfrei's restrictions in order to "clarify" the impact of fluorescent lighting on Plaintiff's condition (AR 104-05). During the peer review process, on May 14, Plaintiff received another Moh's surgery (AR 99, 276-79). On May 29, the peer review was completed by Seth Kates, M.D., a board certified dermatologist (AR 101, 164-65, 405-10). Dr. Kates attempted to contact Dr. Schuldenfrei without success, and so completed the review without benefit of Dr. Schuldenfrei's input (AR 101, 409). Dr. Kates opined that "the effect of fluorescent light [wa]s minimal" and Plaintiff could work indoors with protective clothing and sunscreen (AR 100-01, 405). Hartford decided not to change Plaintiff's status without allowing Dr. Schuldenfrei to comment on Dr. Kates's report, so Hartford forwarded that report to him (AR 100). In June, before Hartford received Dr. Schuldenfrei's comments, Plaintiff underwent yet another Moh's surgery (AR 98, 272-75).

Dr. Schuldenfrei disagreed with Dr. Kates's assessment (AR 374-77). Specifically, he noted that Dr. Kates's assumptions seemed to be based on research of "common" basal cell carcinomas, not Gorlin's syndrome (AR 97, 377). Dr. Schuldenfrei continued, "[i]t is my strong opinion that unless your consultant can cite specific references on patients with this specific syndrome to the contrary, it must be assumed that patients with Nevoid Basal Cell Carcinoma Syndrome require life long limitation of exposure to ultraviolet light from sun and from other sources, including fluorescent lighting." (AR 97, 377). Dr. Schuldenfrei based his recommendation on a consultation with "a leading Dermatologist at the National Institutes of Health who has treated many patients with [Gorlin's] syndrome" (AR 98, 377). Dr. Kates was given the opportunity to respond, and he opined that while Dr. Schuldenfrei's statement was "factually correct," it was "practically incorrect" because ultraviolet radiation from fluorescent bulbs "is, although real, extremely limited and probably not clinically significant compared to other sources of ultraviolet light." (AR 94, 362). According to Dr. Kates, Plaintiff would continue to develop skin cancers "regardless" of his exposure to fluorescent lighting (AR 92). Dr. Kates stated his opinion was based on his three patients with the same condition and the "current literature." Plaintiff also weighed in on the debate: he believed his cancers, which were located on his ears and head, were "exactly" where he was exposed to fluorescent lighting at work (AR 93). Plaintiff also informed Hartford he had received another curettage and cautery procedure on July 10, 2008 (AR 93, 361).

### D. Termination of Benefits

On July 15, 2008, based on a review of Plaintiff's file, a Hartford employee concluded that Plaintiff was no longer eligible for disability benefits because he was able to perform his former job, a sedentary, indoor occupation (AR 92). That employee relied on Dr. Kates's opinion that Plaintiff

7

"should be able to work in an indoor environment with controlled light exposure taking adequate precautions." (AR 92). Hartford terminated Plaintiff's benefits the following day, explaining that Plaintiff could perform his job indoors with controlled light exposure or from his home (AR 90, 158-62, 356-60). Plaintiff complained that his condition was worse at the time of termination than it had been when his benefits were approved, and he expressed his intention to file an appeal (AR 90). The next month, Plaintiff underwent a Moh's surgery and a curettage and cautery procedure (AR 234, 263-71). Moh's surgeries were also performed in October 2008 and January 2009 (AR 196-203, 257-62).

During the pendency of the appeal, Hartford forwarded Plaintiff's file to Vesna Petronic-Rosic, a board certified dermatologist, for another peer review (AR.81, 83, 187-90). Dr. Petronic-Rosic reviewed Plaintiff's medical records and pictures of his lesions and surgeries, and she agreed with Dr. Schuldenfrei's assessment (AR 188). She stated that Plaintiff would "most certainly" require "multiple surgeries" (AR 188). Further, she stated that "if [Plaintiff] is to have surgeries once a month or every 2 months, a week off would be reasonable to enable adequate healing and obviate the need for bulky bandages to be worn to work." (AR 79, 81, 84, 188). Hartford asked Dr. Petronic-Rosic whether this recovery time was necessary due to "physical limitations" or "just due to [Plaintiff] wearing bandages" (AR 83-84). Dr. Petronic-Rosic responded that "[i]f [Plaintiff] were working from home he would need approximately 3 to 4 days off for reasonable healing." (AR 80, 190). She explained that any bending, twisting, or stretching the affected areas during the healing period might cause bleeding and wound dehiscence (AR 82).

### E. Final Appeal Decision

In February 2009, after reassessing Plaintiff's occupational prospects, Hartford rendered its

8

final appeal decision (AR 82, 142-44). Explaining the decision, Hartford marshaled three pieces of evidence. First, Hartford relied on Dr. Petronic-Rosic's opinion that Plaintiff would need three to four days of recovery after each surgery "for reasonable healing" if he were working from home (AR 143). Second, Hartford estimated that Plaintiff would require surgery "on a 2 month or greater basis" (AR 79, 144). To reach that estimate, Hartford noted that during the 16-month period from May 2007 through October 2008, Plaintiff received six surgeries (AR 79).[8] And third, Hartford relied on the results of the occupational research survey to conclude that Plaintiff's job could be performed from home (AR 79). Based on those assumptions, a Vocational Clinical Case Manager determined:

> It is reasonable, given the common practice of employers, the sedentary nature of [Plaintiff's] occupation, and that the occupations identified can be full-filled [sic] by working from home, [Plaintiff] would reasonably be accommodated for a recovery period of 3 to 4

---

[8] A summary of Plaintiff's treatments may be useful:

| Date | Type* | Citation |
|---|---|---|
| January 2009 | Moh's | AR 196-203 |
| October 2008 | Moh's | AR 257-62 |
| August 2008 | Moh's and C&C | AR 234, 263-71 |
| July 2008 | C&C | AR 361 |
| June 2008 | Moh's | AR 272-75 |
| May 2008 | Moh's | AR 276-79 |
| March 2008 | C&C | AR 237 |
| January 2008 | Moh's | AR 280-86 |
| December 2007 | C&C | AR 485 |
| November 2007 | C&C | AR 240 |
| September 2007 | C&C | AR 243 |
| May 2007 | Moh's | AR 246, 287-89 |
| April 2007 | C&C | AR 247 |
| October 2006 | C&C | AR 249 |
| February 2006 | C&C | AR 251 |

*Curettage and cautery is abbreviated "C&C."

9

> days bi-monthly, with additional allowances that could include Saturday and Sunday as recovery days.

(AR 78, 144). Hartford adopted this analysis and concluded Plaintiff was capable of performing the duties of his own occupation in a home environment (AR 144). With his administrative appeals exhausted, Plaintiff filed suit.

## II. ANALYSIS

The parties' dispute, at bottom, is a narrow one: was Hartford justified in concluding that Plaintiff could perform his own occupation despite the periods of recovery associated with his surgeries?[9] Embedded in that dispute are two issues: first, Hartford's estimate of how much recovery time Plaintiff required, and second, Hartford's conclusion, based on that estimate and "the common practice of employers," that Plaintiff's recovery could be accommodated reasonably.

### A. Standard of Review

The applicable standard of review in this case is uncontested [Doc. 23 at 10-11; Doc. 26 at 11-12]. The Plan gave Hartford discretion to determine eligibility for LTD benefits (AR 33-34), and its decisions must therefore be affirmed unless they are "arbitrary and capricious." *Calvert v. Firstar Finance Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005). If it is possible to offer a "reasoned explanation" for the decision, based on all the evidence known to the administrator, then the decision is not arbitrary and capricious. *Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir. 2000); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169, 172 (6th Cir. 2003). Courts must scrutinize the decision to determine whether, "substantively

---

[9] Plaintiff concedes that his work restrictions with respect to fluorescent lighting were obviated by Hartford's reasonable conclusion that Plaintiff could work from home [Doc. 30 at 3].

or procedurally, [the plan administrator] has abused his discretion." *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006) (*aff'd* 128 S. Ct. 2343). Plaintiff does not argue that Hartford's review of his claim was procedurally defective; he challenges instead the substantive decision that he was able to perform his own job. The Court must therefore determine only whether the evidence known to Hartford was adequate, in light of the entire record, to reasonably support that conclusion. *See McDonald*, 347 F.3d at 171 (*quoting Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) for the proposition that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account both the quantity and quality of the evidence).

The court's evaluation of a plan administrator's decision under the arbitrary and capricious standard of review is informed by several factors, including the existence of a conflict of interest. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444-45 (6th Cir. 2009). Hartford concedes it was operating under a structural conflict of interest because it was responsible for both evaluating and paying the claim [Doc. 26 at 12]. However, ERISA plan administrators are fiduciaries with a special duty of loyalty to their insureds, an obligation they bear whether or not they have a financial stake in the decision. *See Glenn*, 128 S. Ct. at 2347, 2350. Thus, a structural conflict can render a particular decision arbitrary and capricious only if it skewed the decisionmaking process in some way. *See Curry v. Eaton Corp.*, 2010 WL 3736277, at *7 (6th Cir. Sep. 20, 2010) (unpublished) (holding that the existence of an structural conflict of interest does not necessarily establish a case-specific bias). For that reason, courts may not give this factor much weight if there

11

is no evidence showing the conflict motivated the decision at issue.[10] *Id.* (declining to consider an inherent conflict because such evidence was lacking). *See also Calvert*, 409 F.3d at 293 n.2 ("The Court would have a better feel for the weight to accord this conflict if Calvert had explored the issue through discovery.").

To provide evidence of a conflict here, Plaintiff mainly points to Hartford's alleged failure to "investigate" whether Plaintiff's recovery periods could be accommodated. As noted above, Hartford relied on the assessment of its own vocational analyst, which was in turn based only on "the common practice of employers." In Plaintiff's view, Hartford was reasonable in conducting an occupational research survey to investigate whether he could work from home to avoid fluorescent light, but Hartford was arbitrary and capricious in failing to conduct a similar investigation into whether employers would permit frequent absences.

I **FIND** that Hartford's reliance on the opinion of its vocational analyst is not evidence that Hartford was predisposed to deny Plaintiff's claim. As Plaintiff acknowledges, Hartford carefully researched Plaintiff's limitations and occupational options with respect to the effects of fluorescent lighting. That Hartford performed more research regarding one limitation than another may show inconsistency, but it does not show bias. Consequently, I **CONCLUDE** Hartford's structural conflict of interest remains a "factor" in the arbitrary and capricious analysis, but not a particularly weighty one. *Glenn,* 128 S. Ct. at 2351 (explaining that courts give more weight to a conflict "where circumstances suggest a higher likelihood that it affected the benefits decision").

---

[10] A plaintiff need not find a "smoking gun" memorandum; she may add weight to this factor by showing, for example, that the insurer has a history of biased claims administration. *See Glenn,* 128 S. Ct. 2351.

12

### B. Hartford's Termination of LTD benefits

#### 1. Hartford's Reversal of its Earlier Decision

Initially, Plaintiff argues Hartford, having already approved of his LTD claim, was obligated to show that he had improved before terminating his benefits. As a general proposition, Plaintiff is correct that an administrator's change of course without any precipitating change in evidence may tend to show that it has acted capriciously. *See*, *e.g.*, *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009); *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009). In *Kramer*, the court found that in the absence of any evidence of medical improvement, an administrator acted arbitrarily and capriciously by terminating benefits it had been paying for five years. 571 F.3d at 507. *Kramer*, however, does not stand for the proposition that "improvement" is *always* required to terminate benefits. *See id.* (indicating that substantial evidence the claimant had *never* been disabled could have supported the decision to terminate benefits); *Cochran v. Hartford Life and Accident Ins. Co.*, 2010 WL 259047, at *8 n.4 (E.D. Mich. 2010). As explained above, an administrator must show that its decision was procedurally sound and supported by substantial evidence, and what evidence is "substantial" will necessarily vary with the facts of each case. Such evidence may sometimes take the form of a claimant's medical improvement, *e.g.*, *Dutton v. Unum Provident Corp / Paul Revere Co.*, 170 F. Supp. 2d. 754, 761-62 (W.D. Mich. 2001), but it will not always. *E.g.*, *Nicolai v. Aetna Life Ins. Co.*, 2010 WL 2231892, at *6 (E.D. Mich. 2010); *Bosin v. Liberty Life Assur. Co. of Boston*, 2007 WL 1101187, at *6 (W.D. Mich. 2007); *Carswell v. Raytheon Emps. Disability Trust*, 142 F. Supp. 2d. 939, 942-43 (E.D. Tenn. 2001). See also *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) (holding that an administrator need only show that the information on which its decision was based changed

13

in some "significant way").[11] New information sufficient to support a termination of benefits may include, as Hartford argues here, a vocational assessment showing that a claimant can perform work which excludes him from eligibility for benefits. *See [Carswell v. Raytheon Emps. Disability Trust, 142 F. Supp. 2d. 939, 942-43 (E.D. Tenn. 2001)](.)*.

Here, I **FIND** that Hartford's change of course was preceded by the receipt of additional information. When approving Plaintiff's claim initially, Hartford relied on Dr. Schuldenfrei's opinion that Plaintiff could not function *in a regular environment*" (AR 125) (emphasis added). At that time, Hartford was still "working on accommodations to [Plaintiff] to [return to work] either in a special room or at home." Hartford's termination of Plaintiff's benefits, on the other hand, was based on the subsequent opinion of Dr. Kates, who stated that Plaintiff could work in an indoor environment with "adequate precautions," and the occupational research survey concluding Plaintiff could work from home (AR 359). Before rendering its final appeal decision, Hartford sought the opinion of Dr. Petronic-Rosic, who stated Plaintiff would need only three to four days recovery if he were working from home. At each turn, then, Hartford's decisions were based on new evidence. Whether that new evidence was "substantial" in light of the record as a whole is a separate question, and it is discussed below, but Hartford's reversal of its initial decision was not, in itself, improper.

### 2. Hartford's Estimate of Plaintiff's Recovery Time

Plaintiff argues that Hartford incorrectly concluded he would need only three to four days of recovery, bi-monthly. He attacks that estimate on two fronts: the length of the recovery period after each surgery, and the frequency of the surgeries. For the reasons below, I **CONCLUDE** there was

---

[11] Plaintiff argues for a rule that neither logic nor sound policy can support. If benefits, once awarded, could be terminated only with a showing of improvement, an insurer would be much more reluctant to give a claimant the benefit of the doubt while the record is being developed.

nothing unreasonable about Hartford's methodology in estimating Plaintiff's recovery time.

### a. Length of Each Recovery Period

Plaintiff argues, based on Dr. Schuldenfrei's opinion, that he needs "a week or more" to recover from each surgery. Hartford, however, relies on Dr. Petronic-Rosic's opinion that he needs only three to four days. Plaintiff argues that Dr. Schuldenfrei's opinion is entitled to more weight because he actually examined Plaintiff and observed him during his recovery after surgeries. Plaintiff's argument – that Hartford improperly favored its consultant's opinion over his treating physician's opinion – assumes there was a conflict between the two doctors' opinions. To the contrary, Dr. Petronic-Rosic *agreed* with Dr. Schuldenfrei's assessment that Plaintiff needed a week's recovery time after surgery. She also explained why: to allow for "reasonable healing" and to "obviate the need for bulky bandages to be worn to work" (AR 188). She later explained, however, that if Plaintiff were working from home, he would need only three to four days recovery time for "wound healing" (AR 190). As Hartford points out, Dr. Schuldenfrei did not offer an opinion specifying the amount of time Plaintiff would need to recover if he were working from home. Because Dr. Petronic-Rosic was the only doctor to offer an opinion on that specific question, Hartford cannot be faulted for relying on it.

Even assuming the two opinions were in direct conflict, Hartford's decision would stand. "Generally, when a plan administrator chooses to rely on the medical opinion of one doctor over that of another in determining [eligibility for benefits], the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based on the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. Moreover, a treating physician's opinion is not entitled to any special deference under ERISA, *Black*

*& Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), except insofar as the contrary opinion is somehow defective – e.g., based on a cherry-picked record, internally inconsistent, or contradicted by objective medical findings, *Smith v. Health Servs. Of Coshocton*, 314 F. App'x 848, 860 (6th Cir. 2009). Here, to the extent it differed from Dr. Schuldenfrei's opinion, Dr. Petronic-Rosic's opinion was well explained and consistent with the medical evidence. I **FIND**, therefore, it was substantial evidence supporting Hartford's conclusion, and I **CONCLUDE** Hartford was not arbitrary and capricious in determining Plaintiff would need only three to four days to recover from each surgery if working from home.

### b. Frequency of Surgeries

Plaintiff also takes issue with Hartford's estimate of the frequency with which Plaintiff would need surgery. Here, neither Dr. Kates nor Dr. Petronic-Rosic offered an opinion (AR 188, 409).[12] Dr. Schuldenfrei, however, did offer an opinion: he stated Plaintiff would need surgery on a monthly basis "for the foreseeable future" (AR 111, 418). Hartford did not take Dr. Schuldenfrei's opinion at face value, but instead extrapolated its own estimate from Plaintiff's surgical history.[13] Specifically, Hartford determined Plaintiff had undergone surgery six times during the 16-month period between May 2007 and October 2008 (or, less frequently than once every two months). Plaintiff contends this estimate is based on "faulty statistical analysis" [Doc. 23 at 18]. First,

---

[12] Dr. Petronic-Rosic stated that Plaintiff would certainly need "multiple surgeries," but did not opine how frequently; she merely stated that "if" surgery were required monthly or bi-monthly, then one week would be a reasonable recovery time (AR 188).

[13] To the extent Plaintiff argues Hartford should have simply accepted his treating physician's forecast rather than estimating the frequency from the record, the argument must fail. Dr. Schuldenfrei opined that surgeries would be required monthly in March 2008 (AR 418), but his prediction subsequently proved incorrect. As explained below, the frequency of Plaintiff's surgeries has varied.

16

Plaintiff argues that Hartford should have calculated its estimate using the eight-month time period from May 2008 to January 2009, during which Plaintiff underwent five Moh's surgeries. Aside from being more favorable to his position, however, Plaintiff has not shown why his truncated timeframe is the relevant one for purposes of determining how frequently he needed surgery. Hartford's timeframe, on the other hand, is defensible. To gain a more complete picture of Plaintiff's condition, Hartford reasonably took a long exposure rather than a snapshot. May 2007, which marks the beginning of the period, coincides with the earliest Moh's surgery in the record – a reasonable place to start counting (AR 246, 287-89).[14] And Plaintiff has not shown why the October 2008 end-date was not a reasonable place to stop counting.[15] Indeed, Hartford began and ended the counting period on months in which Plaintiff had Mohs' surgeries, which may skew the average in Plaintiff's *favor*.[16] There is no indication, therefore, that Hartford manipulated the counting period to Plaintiff's disadvantage. I **FIND** that the record entirely supports Hartford's estimate that Plaintiff had undergone Moh's surgeries, on average, less frequently than once every two months.

Plaintiff also argues that the frequency of his Moh's surgeries had accelerated. The

---

[14] Hartford might have also chosen to calculate its estimate from September 2007, the date when Plaintiff's alleged disability began, or February 2006, the date of the earliest treatment notes in the record. Neither of these start dates would have been any more favorable to Plaintiff, however.

[15] That date might have been extended to January 2009, as it appears Hartford was aware Plaintiff had undergone surgery in January before it calculated its estimate (AR 79, 82), but even adjusting the end-date from October 2008 to January 2009 would not have changed the outcome here. The average time between surgeries would not have been materially different.

[16] To explain, imagine that Plaintiff had surgeries on a perfect bi-monthly schedule: on January 1, then March 1, then May 1, etc. The average rest interval would be two months, but if the average was calculated based on a period both beginning and ending with a surgery, the "average" rest interval would appear shorter. For example, the average rest interval during the period from January 1 to May 1 would be 1 1/3 months (four months divided by three surgeries).

argument, while accurate up to a point, is unavailing. To be sure, Plaintiff underwent Moh's surgeries three times in the four months between May 2008 and August 2008 (AR 263-79). After that spate of surgeries, however, the frequency decreased again, with periods between two and three months preceding the next two surgeries (AR 196-203, 257-62). The record, therefore, does not show a consistent trend. Furthermore, even adopting Plaintiff's suggested timeframe, Hartford's estimate is quite close to the mark. During the 34-week period between May 14, 2008, and January 6, 2009, Plaintiff received five surgeries, for an average of about one surgery every 7 weeks, and Plaintiff's two most recent surgeries were separated by a period of two and a half months (AR 196-203, 257-62, 276-79). I **CONCLUDE** Hartford's methodology, which is based directly on the record evidence, was not arbitrary and capricious.

### 3. Hartford's Conclusion Plaintiff's Recovery Could be Accommodated

The assumptions on which Hartford's analysis was based, therefore, were reasonable. Furthermore, as Hartford points out, subtracting weekends from those bi-monthly, three to four-day recovery periods, Plaintiff could be expected to be absent one to two weekdays every two months – i.e., no more than one day per month. Plaintiff nonetheless argues Hartford's ultimate conclusion, that Plaintiff's absences could reasonably be accommodated, was arbitrary and capricious. As noted above, Hartford adopted the opinion of its "employability" analyst, who stated:

> It is reasonable, *given the common practice of employers*, the sedentary nature of the claimant's occupation, and that the occupations identified can be full-filled [sic] by working from home, the claimant would be reasonably accommodated for a recovery period of 3 to 4 days bi-monthly, with additional allowances that could include Saturday and Sunday as recovery days.

(AR 78-79, 144) (emphasis added). Hartford now defends that conclusion by arguing it was based

18

on the practice of Plaintiff's own employer, Navy. As Plaintiff points out, however, Navy did not agree to accommodate any specific number of absences. Navy agreed only to allow Plaintiff to work from home. Hartford has not identified any other record evidence defining the "common practice of employers," and the propriety of Hartford's decision therefore turns on whether it was reasonable to rely on the analyst's opinion itself to support the benefits decision.

Unless a vocational analyst's opinion "ignores unrefuted evidence" in the record, [Evans v. UnumProvident Corp., 434 F.3d 866, 879-880 (6th Cir. 2006)](#), a plan administrator may properly rely on that opinion to determine whether a claimant's limitations prevent him from working. *See* [Nichols v. Unum Life Ins. Co. of Am., 192 F. App'x 498, 501-03 (6th Cir. 2006)](#) (not arbitrary and capricious to rely on an "in-house" vocational resource). That, indeed, is what a vocational expert is hired to do. I **FIND** it was reasonable for Hartford to rely upon its vocational expert's opinion that employers commonly would accommodate Plaintiff's recovery period under the circumstances at issue. If Plaintiff had any evidence to the contrary, such as his own vocational expert's opinion, he could have submitted it to Hartford. Plaintiff, after all, bore the burden of proof to show he was no longer able to perform his job's duties. *See* [Rose v. Hartford Fin. Servs. Group, Inc., 268 F. App'x 444, 452 (6th Cir. 2008)](#). Accordingly, on this record, I **CONCLUDE** Hartford did not act arbitrarily or capriciously in accepting its vocational analyst's opinion.

### III. CONCLUSION

Having carefully reviewed the administrative record and the pleadings, I **RECOMMEND** that:[17]

(1) Plaintiff's motion for judgment on the pleadings [Doc. 22] be **DENIED**;

(2) Defendant's motion for judgment on the pleadings [Doc. 25] be **GRANTED**; and

(3) This action be **DISMISSED WITH PREJUDICE**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[17] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).
  This document contains hyperlinks to other documents. Such links are provided for the user's convenience only, and the Court does not guarantee their functionality or accuracy. Any link which directs the user to a document other than the document cited in the text will not supersede the textual citation. The Court does not endorse the content of any document maintained by any other public or private organization.